HARDING GLASS CO. *v.* MOORE.

5-1874                                                 327 S. W. 2d 8

Opinion delivered September 7, 1959.

*Shaw, Jones & Shaw,* for appellant.

*Luke Arnett,* for appellee.

CARLETON HARRIS, Chief Justice. The sole question in this litigation is whether there was substantial evidence to support the finding of the Workmen's Compensation Commission that the condition of Earl J. Moore, who died from cirrhosis of the liver, was aggravated by the examination and/or treatment incident to an accidental injury (admittedly compensable[1]) occurring on June 10, 1955.

Moore was injured during the course of his employment, while lifting a box of glass, and a diagnosis of back strain, or herniated disc, was made. He was first examined by Dr. James V. Thompson, who was Moore's family physician. Moore was admitted to the hospital, under a diagnosis of possible ruptured disc, and placed in traction. The patient did not respond to this treatment, continuing to have pain, and x-rays were taken on June 16, and also on July 5, at which time a myelogram was made by Drs. E. A. Mendelsohn and Hoyt Kirkpatrick. The doctors agreed that Moore had a large defect in the spinal canal at the region of the fourth and fifth lumbar vertebrae, representing a ruptured intervertebral disc pressing on a nerve, and on the basis of such diagnosis, referred Moore to Dr. Frank Padberg in Little Rock for surgery. Dr. Padberg performed the operation. He testified that at the time of the operation, he noticed some suspicious tissue, grayish in color, and a laboratory analysis was made. According to his evidence, it appeared to be tumor, but the pathological report did not show tumor, but a markedly degenerated tissue. Dr. Padberg stated he found other suspicious tissue, which was sent to the laboratory, and determined to be degenerated cartilage. Following the operation, performed July 29, 1955, Moore was discharged to his home in Fort Smith on September 14, 1955, but returned to the hospital in January, 1956, because of severe nasal hemorrhage, occasioned by the cirrhosis of the liver. He remained in the hospital until April 29, 1956, when he died. As indicated in the opening paragraph, appellee does not contend that the acci-

---

[1] Deceased was paid compensation for 46 6/7ths weeks, and all medical expenses were paid until the date of death, April 29, 1956.

dental injury and subsequent treatment caused the death of the deceased, it being admitted that he died of cirrhosis of the liver, but appellee's position is that the pre-existing disability was aggravated by the accident, medical treatment, and operation, and thus hastened Mr. Moore's death. Appellants simply contend that Moore died by reason of cirrhosis of the liver, and that the injury, examination, operation, and treatment were not an aggravation of his existing condition, and did not operate to hasten his death.

All physicians agreed that the deceased was afflicted with osteomyelitis at the time of his death, and that this infectious condition aggravated the existing case of cirrhosis of the liver. No point would be served in detailing the testimony of the physicians, but in brief, Doctors Padberg, John M. Hundley, and Dr. Alfred Kahn, Jr., of Little Rock, appearing for appellants, testified that the osteomyelitis was present at the time of surgery. Dr. Padberg would not give an opinion as to whether the infection preceded the date of the accidental injury, June 10, 1955; however, he did state that he thought the infectious process antedated the myelogram, which was done on July 5, 1955. According to Dr. Padberg:

"I took the patient to the x-ray department and fluoroscopic examination was carried out and we were able therefore to go ahead with the myelogram under our own direction here, and went ahead and identified this large filling defect at the L4-5. It was my impression that the — I thought the patient probably had a herniated nucleus pulposus in his lower lumbar spine and he was okayed and checked through with internal medicine clearance that I should subject him to medical operation. * * *"

He then stated:

"I had Dr. Hundley to come in and see this patient at operation. I had found something here that was, to me, not common for a ruptured disc by any sense of means, which didn't go along with — I couldn't explain on that basis the emptiness of the disc space."

According to his evidence, the deceased did not in fact have a herniated disc, but instead, this condition was due to the osteomyelitis, which was present at the time.

Dr. Hundley then testified as follows:

"Instead of there being a ruptured disc, there was an infection. We know that, in retrospect because at the operation it was obvious an infection was present and not a ruptured disc."

In his opinion, the osteomyelitis had been present for some time before surgery, and the injury could not conceivably have caused this condition. He stated that the spine is very deep, and in order for an injury to cause the osteomyelitis, there would have to be a break in the skin directly over bone. Since there was no break caused by the injury, it was his opinion that the bacteria had to come through the vascular veinous system; in other words, the osteomyelitis was systemic. Dr. Hundley was of the opinion that the operation was of great benefit to Moore, and prolonged his life; that the discovery of osteomyelitis in the advanced stage and the surgery offset any trauma from the surgery or from the injury, for the reason that treatment was given for the osteomyelitis which would not have been discovered except for the operation.

Dr. Kahn stated that in his opinion the infection was present prior to the June 10th injury. He testified, and in fact, all the doctors agreed, that there is a trauma from anesthetic, and trauma from operation, both of which were relatively serious in this particular case because of the existing cirrhosis of the liver. For that reason, Moore was given a spinal anesthesia rather than a general anesthetic, which resulted in a mild trauma, but in the opinion of Dr. Kahn, had no effect upon the life span of Moore. The doctor testified that the post-operative shock was negligible, and that Moore was definitely better when he left the hospital after the operation, than when he entered. It was his opinion that the operation lengthened Moore's life span.

To summarize appellants' evidence, osteomyelitis was present at the time of the operation, and therefore could not have been occasioned by the operation, and the osteomyelitis was not caused by the June 10th injury.

Doctors Thompson, Albert S. Koenig, and E. A. Mendelsohn testified on behalf of appellee. Dr. Thompson stated that in his opinion, Mr. Moore's cirrhosis was definitely aggravated by the anesthetic, surgery, and the infection. He stated that Moore would have eventually died from the liver condition, but it was his opinion that death would not have come so soon. He cited the fact that Moore had been afflicted with cirrhosis for quite some time, and yet had continued about his work, working until the time of the accident. He was of the opinion that the infection followed the surgery, but he likewise stated he considered that the surgery, anesthetic, and infection, all hastened Moore's death. He further testified he felt that even though no osteomyelitis had been present, the trauma from the surgery and anesthetic would have hastened the patient's death. His opinion that the osteomyelitis followed the surgery was based on the report by Dr. Mendelsohn, hereinafter discussed, to the effect that there was no evidence of osteomyelitis at the first examination.

Dr. Koenig performed an autopsy on the body of Moore, and testified that he found osteomyelitis in the vertebrae which lay under the incision. From his testimony:

"Well, osteomyelitis in the vertebrae could be due to one of several causes. It was my impression at the time, not knowing anything about the man's previous history, that the infection could possibly have been secondary to the surgical procedure. In other words, there may have been contamination of the wound during the period of the surgical procedure and that the osteomyelitis followed that."

Further: "I certainly feel that the operative procedure didn't do him any good, and I certainly feel that

the cirrhosis was aggravated by what he had been through.''

He testified that he could not state whether the osteomyelitis existed prior to the operation, but would positively state that both the operation and the infection hastened death. He was further of the opinion that the surgery contributed more to the hastening than the infection. It was also his belief that the injury received at the time of the accident contributed to an earlier demise.

Dr. Mendelsohn was of the opinion that the initial injury had nothing to do with the osteomyelitis because there was no exposure of the bone. He considered the time element as significant in that the x-ray of June 16, 1955, was negative, and there was no evidence of bone infection in the x-ray of July 5th, though there was some evidence of pressure between the fifth lumbar vertebrae and the sacrum[2], but the osteomyelitis clearly showed in an x-ray two months later. It was therefore his opinion that the osteomyelitis was occasioned by some source of medical infection, specifically, either at the time the myelogram was made or at the time of surgery. He testified that he could not determine which, but stated on cross-examination that if the infection was present at the time of surgery (as testified to by appellants' witnesses), the bacteria must have been introduced into the body at the time of the myelogram. He admitted that an osteomyelitis infection caused from myelogram was remote, ''but it may happen.'' He stated that osteomyelitis is demonstrable on x-rays within two to three weeks from its inception.

''I (still) can state that on July 7th no infection was present older than two or three weeks and apparently at the time of surgery the infectious process was rather early as far as the bone is involved, as far as the bone involvement goes, and would be very compati-

---

[2] In retrospect, Doctors Hundley and Padberg were of the opinion that this picture only simulated a herniated disc when in fact, it was the infectious process that was present at that time.

ble with my findings that an early osteomyelitic process was present at the time of surgery and the three week interval would again suggest the myelogram as a possible cause because the operation was performed exactly three or two and a half weeks following the myelogram.''

He also testified that the infection was in the ''* * * very same location * * * the infectious process developed at the same level the myelogram was made.''

The Commission, in its opinion, under ''Statement of the Case'', *inter alia,* stated as follows:

''While there is a divergence of medical opinion in this case as to whether deceased's death was in any way related to injury, there is nevertheless unanimity of medical opinion that osteomyelitis will aggravate an existing case of cirrhosis of the liver. There is also medical evidence of record that surgical procedures and anesthesia are factors which may aggravate an existing cirrhosis of the liver. In view of the unanimity of medical opinion that osteomyelitis will aggravate a liver condition, such as this deceased suffered, it becomes important to establish the time when this deceased contracted osteomyelitis. In this connection we know that the osteomyelitis was first discovered at surgery on July 29, 1955. Now let us turn to the testimony of the radiologist, Dr. E. A. Mendelsohn. Dr. Mendelsohn testified that he made x-ray examination of deceased's back on two occasions prior to deceased's operation, the first being June 16, 1955, and the second being July 5, 1955, on which latter date, as has been set out hereinabove, Dr. Mendelsohn performed myelographic examination. It is the testimony of Dr. Mendelsohn that the presence of osteomyelitis can accurately be determined by x-ray examination; that when he examined deceased on June 16, 1955, and on July 5, 1955, there was no x-ray evidence of osteomyelitis; that osteomyelitis can be detected by x-ray within two or three weeks after the osteomyelitis is first contracted; that upon x-ray examination of deceased on September 22, 1955, which was after deceased's operation, a typical picture of osteomye-

litis of the spine was found. * * * Our interpretation of all the evidence herein leads us to the conclusion, based on the time element in x-ray disclosures of osteomyelitis and the sequence of events pertaining to examination and treatment of deceased, that most likely deceased's osteomyelitis was from a blood stream infection which localized as a result of the trauma inflicted by myelographic examination.''

Appellants point out that the medical witnesses for appellee disagreed with each other's findings, *i.e.,* Dr. Thompson felt that the infection was caused by the surgery, but further testified that the trauma from the surgery and anesthetic would even more have hastened death. Dr. Koenig felt that the surgery was the hastening cause of death, and that the infection was caused by the operation: also that the injury received at the time of the accident contributed to the aggravation of the liver condition, while Dr. Mendelsohn was of the opinion that the osteomyelitis was probably caused by the myelogram of July 5th. We accordingly have expert evidence that the osteomyelitis was present before the injury, and to the contrary, that it was not present until after July 5th. But appellants argue that the Commission, in its opinion, rejected the contention that the osteomyelitis was occasioned by the surgery (since they apparently accepted the testimony of appellants' medical witnesses that osteomyelitis was present before the operation); that they could not have found it was occasioned by the injury because they accepted Dr. Mendelsohn's testimony; that they gave no credence to aggravation by anesthesia or surgery, and that accordingly, the Commission's award was based entirely upon Dr. Mendelsohn's testimony that the osteomyelitis probably resulted from the myelogram of July 5th — and appellants say this witness' testimony did not constitute substantial evidence. It is then pointed out that Dr. Mendelsohn was far from positive in his evidence. After explaining that a myelogram is a traumatic procedure because a needle is introduced through normal tissues, the doctor was asked: ''I want to put you on the record, Doctor. You come back with the proposi-

804

tion that in your opinion this osteomyelitis that you found was caused by the injection of the needle upon the giving of the myelogram. Is that your opinion? A. It is a possibility.'' While we recognize that this was certainly not positive evidence, we are unable to agree with appellants' contention. Dr. Mendelsohn *was* very positive that neither the x-ray of June 16th nor July 5th showed any osteomyelitis, and we consider that this testimony constituted substantial evidence that this infection was not present at that time. Of course, Dr. Mendelsohn could not positively state what caused the osteomyelitis, or when it occurred, but he was emphatic *that it occurred subsequent to July 5th.* Medical experts, not infrequently, are less than positive in their declarations when diagnosing causes of physical disabilities. In many instances they are forced to speculate, for a particular condition could have been reached from several causes. Furthermore, we do not agree that the Commission, in its opinion, completely discarded, as unfeasible, the evidence that Moore's death was hastened by surgery or anesthetic. Were this true, there would have been no occasion to include the statement heretofore quoted, *viz.,* ''there is also medical evidence of record that surgical procedures and anesthesia are factors which may aggravate an existing cirrhosis of the liver'', — and their conclusion is as follows: ''As a consequence of the evidence of record, we think it inescapable to conclude that deceased's cirrhosis of the liver, which disease occasioned death, was aggravated by *examination and treatment*[3] incident to deceased's injury of June 10, 1955.'' Actually, we consider that the Commission found that examination and treatment subsequent to the injury hastened Moore's death, and then proceeded to speculate as to what particular phase of the subsequent examination or treatment aggravated his condition; in their words, ''\* \* \* *that most likely* deceased's osteomyelitis was from a blood stream infection which localized as a result of the trauma inflicted by myelographic examination.''

[3] Emphasis supplied.

We are without authority to decide whether the osteomyelitis was occasioned by trauma, or was systemic in origin, or whether the surgery or anesthesia aggravated Moore's condition. It is not within our province to determine which doctor, or doctors, were correct. All are prominent, and recognized as well qualified; nor are we required to agree with the findings reached by the Commission. We are only called upon to determine whether there was substantial evidence to justify the Commission in the conclusion reached. Since we are of the opinion that the record does contain evidence of a substantial nature to support the view of the Commission, the judgment of the Circuit Court is hereby affirmed.